



# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

The Grand Canyon Trust,

           Plaintiff,

    v.

Tucson Electric Power Company,

           Defendant.

No. CV01-2189 PCT EHC

**CONSENT DECREE**

### I.   BACKGROUND

A.      On December 21, 1977, the U.S. Environmental Protection Agency ("EPA") issued Tucson Electric Power Company ("TEP") a pre-construction review permit to build two 380 megawatt coal-fired electricity generating facilities ("Unit 1" and "Unit 2") to be located in Springerville, Arizona (the "Springerville Generating Station" or "SGS"). The permit was issued pursuant to the Clean Air Act of 1977 ("CAA") and the Prevention of Significant Deterioration regulations ("PSD") of 1975 as amended on November 3, 1977. The PSD rules provided that the permit would become invalid if construction was not commenced within 18 months (i.e., by June 21, 1979).

B.      The Springerville Generating Station is located on the Colorado Plateau, the basin at the juncture of Colorado, Arizona, New Mexico, and Utah, and which contains numerous geological features and more than twenty National Parks, National Monuments,

National Landmarks, and National Recreation Areas, including the Grand Canyon, Bryce Canyon, and Zion National Parks.

C.    SGS' 1977 permit provided that the new generating units would be subject to Subpart D New Source Performance Standards ("NSPS") for Fossil-Fuel-Fired Steam Generating Units (40 CFR Part 60, Subpart D).  However, if construction commenced after September 18, 1978, Units 1 and 2 could have been subject to the more stringent standards in the Subpart Da NSPS (40 CFR Part 60, Subpart Da).  In June 1978, EPA promulgated revised PSD rules.  Facilities with permits issued under the 1975 rules were and are exempt from the requirements of the 1978 PSD rules so long as they "commenced construction" prior to March 19, 1979.  TEP subsequently constructed Units 1 and 2 (and associated facilities) and advised EPA of its progress.  Construction of Unit 1 was completed in 1985 and Unit 2 was completed in 1990.  At no time did EPA ever notify TEP that the Agency considered Springerville Generating Station's construction not to have commenced prior to September 18, 1978 or March 19, 1979, or that it had lost its approval to construct.

D.    In early 2001, TEP announced a plan to increase the generating capacity of the SGS by constructing two additional power generating units -- Unit 3 and Unit 4. TEP contemplated contemporaneously reducing emissions from Units 1 and 2 such that the SGS' net emissions after constructing Units 3 and 4 would be no more than its past emissions from Units 1 and 2 alone (often described as "Netting"), thus avoiding PSD pre-construction review requirements for NOx and SO2 that might otherwise have been triggered by the expansion.

E.    The Grand Canyon Trust ("Grand Canyon") is a non-profit, regional conservation organization incorporated in 1985 and headquartered in Flagstaff, Arizona.  It is dedicated to conserving the natural resources of the Colorado Plateau.  After providing EPA 60-days notice of its intent to sue TEP, Grand Canyon filed this suit on November 11, 2001 under the citizen suit provisions of the CAA in relation to the SGS expansion.  Grand Canyon's first amended complaint (the "Complaint") alleged in part:

- 2 -

(1)    that TEP (a) had not "commenced construction" (within the meaning of applicable rules) of the Unit 1 and Unit 2 steam generating units prior to September 18, 1978; (b) TEP had not "commenced construction" of the SGS prior to March 19, 1979 or prior to June 21, 1979; and (c) once construction did commence, construction was discontinued for one or more 18 month periods and construction was not completed within a reasonable time;

(2)    that because construction commenced after applicable dates and/or was not continuous and/or not timely completed, (a) the December 1977 PSD permit became invalid prior to completion of construction of Units 1 and 2; and (b) Units 1 and 2 are subject to the more stringent Subpart Da NSPS; and

(3)    that TEP was in continuing violation of the CAA because (a) it had constructed and operated Units 1 and 2 without a valid PSD permit; (b) NSPS Subpart Da emission limits were applicable to SGS, and TEP had been emitting pollutants in violation of those emission limits.

F.    On February 13, 2002, the EPA wrote to the Arizona Department of Environmental Quality ("ADEQ") objecting to the modification of TEP's Title V operating permit to allow the construction of Units 3 and 4 without PSD review. As the basis for its objection, EPA asserted that:

> TEP failed to commence construction on Units 1 and 2 at the [SGS] by March 19, 1979, as required by the 1978 PSD rules, and hence was not grandfathered out of the need to obtain a PSD permit under the 1978 PSD rules. TEP did not begin physical on-site construction by that date. The contractual obligation incurred by TEP prior to March 19, 1979, did not cover the "source" as defined by the 1978 PSD rules. In addition, the contractual obligation incurred by TEP prior to March 19, 1979, did not include penalties or "substantial loss" in the event of TEP's cancellation or modification of that contract. Either of these latter two flaws in the contract would preclude a finding that TEP had commenced construction in a timely manner. As a result, Units 1 and 2 were constructed and are operating without a valid PSD permit, in violation of the SIP and the CAA. Thus, the NOx and SO2 emissions reductions TEP proposed to use to net Units 3 and 4 out of full PSD review are not available for that purpose. Therefore, Units 3 and 4 must go through full PSD review and permitting under the SIP.

- 3 -

G. TEP has consistently denied the allegations in Grand Canyon's Complaint and the conclusions in EPA's February 13, 2002 letter to ADEQ.

H. EPA, ADEQ and TEP thereafter negotiated a resolution of emission limits for the SGS. TEP agreed, among other things, to cap its emissions such that sulfur dioxide emissions and NOx emissions from all four units (when constructed) would be up to 55% less and 39% less, respectively, than those produced by Units 1 and 2 alone prior to the modifications. On April 25, 2002, EPA wrote to ADEQ stating that "the issues [had] been substantially addressed." On April 29, 2002, ADEQ issued to TEP a significant revision (permit Number 1001554) to the Title V permit (permit Number 1000105) authorizing the construction of Units 3 and 4 and the modifications to Units 1 and 2 and imposing the emission caps.

I. In consideration of the terms hereof and a separate settlement agreement entered among TEP and Grand Canyon in connection herewith, and to avoid further protracted litigation, including the resolution of several dispositive motions filed by TEP and Grand Canyon that are currently pending before this Court, Grand Canyon and TEP each consent to the entry of this Consent Decree ("Decree" or "Consent Decree") without further trial or appeal, and without admitting any fact or liability, to resolve Grand Canyon's allegations.

NOW THEREFORE, it is hereby AGREED, ORDERED AND DECREED as follows:

## II.     JURISDICTION AND VENUE

1. This Court has jurisdiction over the Parties to and the subject matter of this action under CAA Section 304, 42 U.S.C. § 7604 (the citizen suit provision), and under 28 U.S.C. §§ 1331.

2. Venue is proper in this Judicial District under CAA Sections 304(c), 42 U.S.C. § 7604(c), and under 28 U.S.C. §§ 1391(b) and (c).

- 4 -

### III.   DEFINITIONS

3.      Unless otherwise expressly provided herein, the Capitalized terms used in this Consent Decree shall have the following meanings:

(a)      Terms defined in Part 1 of this Decree shall have the meanings assigned in that Part.

(b)      "Calendar Day" means any 24-hour period between 12:00 midnight and the following midnight in Arizona.

(c)      "Court" means the United States District Court for the District of Arizona.

(d)      "Day" means a Calendar Day.  In computing any period of time under this Decree. except in computing compliance with emission limitations, where the last day would fall on a Saturday, Sunday, or federal or Arizona holiday, the period shall run until the close of the next business day.

(e)      "Malfunction" shall have the meaning ascribed to that term in §§ II.A.1.c and I.B.7 of Attachment B to the Operating Permit, and which is repeated here for convenience, as follows:

"Malfunction" means any sudden and unavoidable failure of air pollution control equipment, process equipment or a process to operate in a normal and usual manner, but does not include failures that are caused by poor maintenance, careless operation or any other upset condition or equipment breakdown which could have been prevented by the exercise of reasonable care.

(f)      "Major Burner Malfunction" is, for the purposes of complying with the NOx emission limitation in § 10 of this Decree, a Malfunction (as defined above) that is unanticipated and that requires extensive repairs to the low NOx burners (as identified in § 6 of this Decree) and the Secondary Overfire Air dampers that are internal to the boiler at Unit 1 or Unit 2.

(g)      "NOx" means total oxides of nitrogen, except nitrous oxide. which are expressed as nitrogen dioxide using EPA Reference Method 7.

(h)     "Operating Permit" means permit No. 1000105 and significant revision No. 1001554 as issued by the ADEQ to TEP for the Springerville Generating Station facility on July 27, 1999 and April 29, 2002 respectively, pursuant to Title V of the CAA and Title 49, Chapter 3 of the Arizona Revised Statutes.

(i)     "Parties" means Grand Canyon and TEP (each as "Party").

(j)     "PM" or "Particulate Matter" mean any airborne, finely divided solid or liquid material, other than uncombined water, with an aerodynamic diameter smaller than 100 micrometers, and which is expressed as PM using EPA Reference Method 5.

(k)     "Shutdown" shall have the meaning ascribed to that term in § II.A.1.b of Attachment B to the Operating Permit, and which is repeated here for convenience, as follows:

> "Shutdown" commences when the unit load is to be lowered below the typical minimum load for the purposes of removing the unit from the system. Shutdown includes all activities necessary to safely remove the unit from service, including, but not limited to, all operations and maintenance activities, fuel changes, delays related to equipment and system requirements and load change delays. Shutdown is completed when all activities are completed to safely place the unit in cold or hot standby conditions.

(l)     "SO2" means sulfur dioxide.

(m)     "Start-up" shall have the meaning ascribed to that term in § II.A.1.a of Attachment B to the Operating Permit, and which is repeated here for convenience, as follows:

> "Start-up" commences with the first preparations to combust fuel in the boiler, except for hot startup, which includes all time and fuel combustion required to maintain the unit at hot standby. Startup activities include, but are not limited to, all operations and maintenance activities, fuel changes, temperature related holding periods and delays related to equipment or system requirements. Startup is completed when all of the following conditions are met: 1) the flue gas system temperatures have reached a sustained level of 290 °F at the inlet of the Spray Dryer Absorbers (SDAs) for placement of the SDAs in continuous operation and a sustained level of 190 °F at the inlet of the baghouse for placement of the baghouse in continuous operation. The operator may place either the SDA or the baghouse in

- 6 -

operation before reaching the temperatures described above if he or she determines that it may be safe to do so, 2) the plant restrictive temperatures and air-flow requirements have been met and 3) the unit is capable of further load increases. Startup may be a single smooth sequence of events, or, alternatively may require several attempts, and is not necessarily of predictable duration. The startup operation may require placing the SDA or the baghouse in and out of service, as may be required if temperatures drop below safe levels, until all conditions of the startup operation are met and the operator determines that the unit is no longer in startup mode.

(n)    "Unit" means Unit 1 or Unit 2.

(o)    "Unit 1" and "Unit 2" are the existing steam generating units at the SGS.

(p)    "Unit 3" and "Unit 4" are the proposed steam generating units at the SGS.

## IV.    APPLICABILITY

4.    This Decree shall apply to and be binding upon Grand Canyon and TEP, and their respective officers, agents, successors, and assigns, including successors in title to the SGS and any successor operators of the SGS.

## V.    EMISSION CONTROLS AND LIMITATIONS

5.    SO2 Controls.  TEP shall complete the installation of an additional Spray Dryer Absorber ("SDA") module on each of Units 1 and 2.

6.    NOx Controls.  TEP shall complete the installation of new Low NOx Burners on each of Units 1 and 2.

7.    In-Line Analyzer.  On or prior to December 31, 2006, TEP shall install and certify, and thereafter operate an in-line elemental coal analyzer upstream of both the Unit 1 and Unit 2 boilers, which will be available to both Units.

8.    SO2 Mass Emission Limits.  At all times from and after December 31, 2006, including periods of Start-up, Shutdown, and/or Malfunction, TEP shall not cause to be discharged to the atmosphere from the stack of Unit 1 and Unit 2 any gases which contain

sulfur dioxide in excess of 0.27 pounds per million Btu ("lbs/MMBtu") derived from fossil fuels, based on a 12-month rolling average, averaged over Units 1 and 2.

9.     SO2 Control Efficiency.   At all times from and after December 31, 2006, except for periods of Start-up, Shutdown, and/or Malfunction, SO2 emissions from Unit 1 and Unit 2 shall be limited to 15% or less of the potential boiler inlet SO2 concentration (85% reduction) based on a 90-day rolling average, averaged over Units 1 and 2.

10.     NOx Mass Emission Limits.   At all times from and after December 31, 2006, except for periods of Major Burner Malfunction, TEP shall not cause to be discharged to the atmosphere from the Stack of Unit 1 and Unit 2 any gases which contain nitrogen oxides, expressed as NO2, in excess of 0.22 lbs/MMBtu derived from fossil fuel, based on a 12-month rolling average, averaged over Units 1 and 2.   The exception for periods of operation during a Major Burner Malfunction is applicable only if (a) TEP reports the Major Burner Malfunction to ADEQ within two (2) business days and, (b) within seven (7) business days, provides the ADEQ with a compliance plan to correct the Major Burner Malfunction as expeditiously as practicable.

11.     PM Mass Emission Rate.   At all times from and after January 1, 2006, TEP shall not cause to be discharged to the atmosphere from the stack of Unit1 and Unit 2 any gases which contain Particulate Matter in excess of 0.03 lbs/MMBtu derived from fossil fuel, except for periods of Start-up, Shutdown or Malfunction.

12.     Applicability of Sulfur Dioxide and Nitrogen Oxides Emission Caps. Commencing December 31, 2006, emissions from Units 1 and 2 shall become subject to the sulfur dioxide and nitrogen oxides emission caps set forth, respectively, in § III.A.3.d(2)(a) and § III.A.4.c(1)(a) of Attachment B to the Operating Permit (the "Two-Unit Caps"). These limits shall expire when the three-unit caps become effective under the terms of the Operating Permit, as set forth, respectively, in § III.A.3.d(2)(b) and § III.A.4.c(1)(b) of Attachment B to the Operating Permit.

13.   Early SO2 Controls.  From and after January 1, 2006 through December 31, 2006, except for periods of Startup, Shutdown, or Malfunction and periods where, in the exercise of good engineering judgment and good air pollution control practices, a reduced level of scrubbing is necessary to test, break in or adjust equipment:

(a)   TEP shall scrub the entire flue gas stream on each of Unit 1 and Unit 2 using all four Spray Dryer Absorber modules unless unit load requires a lesser number of Spray Dryer Absorbers in service to maintain the appropriate flue gas flow distribution; provided that, in no event shall any flue gas flow be bypassed around the Spray Dryer Absorbers unscrubbed.

(b)   TEP shall operate Units 1 and 2 to achieve 80 percent reduction in SO2 on a 90-day rolling average over Unit 1 and Unit 2 in accordance with the procedure in § 18 of this Decree.

14.   Early NOx Controls.

(a)   The new Low NOx Burners referred to in § 6 of this Decree shall be operated as soon as practicable following installation.

(b)   During the period between January 1, 2006 and December 31, 2006, TEP shall operate Unit 1 and Unit 2 to reduce NOx emissions in a manner (to the maximum extent practicable) consistent with achieving the limits in § 10 of this Decree whenever the Unit is operating, except during periods of Startup, Shutdown, Malfunction and/or Major Burner Malfunction and where, in the exercise of good engineering judgment and good air pollution control practices, a reduced level is necessary to test, break-in or adjust the new equipment.

15.   Good Air Pollution Control Practices.   TEP shall at all times, including periods of Startup, Shutdown, and Malfunction, maintain and operate Unit 1 and Unit 2 in a manner consistent with good air pollution control practices for minimizing emissions. Without limiting TEP's obligations in the event of a Malfunction, from and after the effective date of this Decree, TEP shall address each Malfunction affecting Unit 1 or Unit 2

- 9 -

and take corrective action, when possible, within 24 hours of when the TEP first learns of the Malfunction.  Malfunctions that cannot be corrected within a 24 hour period shall be reported to the ADEQ within two (2) business days and a plan for bringing the affected Unit(s) into compliance shall be submitted to the ADEQ within seven (7) business days, unless the Malfunction can be corrected within seven (7) business days.

## VI.   EMISSIONS MONITORING AND COMPLIANCE

16.   TEP's compliance with the PM emission limit as set forth in § 11 of this Decree shall be determined in accordance with the existing terms of the Operating Permit applicable to determining compliance with §II.A.2 of Attachment B to the Operating Permit (the particulate matter emission standard for Unit 1 and Unit 2).

17.   TEP's compliance with the SO2 and NOx emission limits as set forth in § 8 and § 10 of this Decree shall be determined as follows:

(a)   From and after December 31, 2006, TEP shall record Hourly Average Emission Rate (as defined below) data for SO2 and NOx in lbs/MMBtu for each hour of Unit operation.

(b)   From and after December 31, 2007, each calendar month TEP shall calculate a 12-month rolling average emission rate calculated as the arithmetic average of the immediately prior 12 Monthly Averages (as defined below), in lbs/MMBtu (the "Consent Decree Emission Rate").  This calculation shall be made available for review by the fifth working day following the end of each rolling 12-month average period.

(c)   If the calculated Consent Decree Emission Rate exceeds the applicable mass emission limit set forth in § 8 and § 10 of this Decree, TEP shall be in violation of such mass emission limit, and shall be deemed to have been in violation for each Day in the last occurring calendar month included in the calculation of such Consent Decree Emission Rate.

- 10 -

(d)     For purposes of this § 17, the following capitalized terms shall be defined as follows:

(i)     "Emission Rate" means the total amount of a pollutant emitted from an emission unit during a given time period, expressed in lbs/MMBtu, derived for SO2 and NOx from a SO2 or NOx continuous emission monitoring system and diluent (O2 or CO2) monitoring system consistent with 40 CFR Part 75.

(ii)    "Hourly Average" means the calculated arithmetic average hourly Emission Rate, expressed in lbs/MMBtu, derived from an SO2 and/or NOx continuous emission monitoring system and diluent (CO2 or O2) monitoring system consistent with 40 CFR 75, collected during an hour, beginning on the hour.

(iii)   "Daily Average" means the arithmetic average of the Hourly Averages for a Unit in a Day.

(iv)    "Combined Daily Average" means the arithmetic average of the Daily Averages of Unit 1 and Unit 2 on a given day.  For days when only one Unit has any operating hours, the Combined Daily Average shall be the Daily Average for that Unit.

(v)     "Monthly Average" means the arithmetic average of the Combined Daily Average Emission Rates for Units 1 and 2 for a calendar month.

18.     TEP's compliance with the SO2 reduction requirement as set forth in § 9 shall be determined as follows:

(a)     From and after December 31, 2006, except for periods of Startup, Shutdown or Malfunction, TEP shall separately record (i) Hourly Average Boiler Inlet Sulfur Dioxide Concentrations and (ii) Hourly Average Stack Outlet Sulfur Dioxide Concentrations, for Unit 1 and Unit 2.

- 11 -

(b)     For each calendar day TEP shall calculate (i) the arithmetic average of the Hourly Average Boiler Inlet Sulfur Dioxide Concentrations, expressed in lbs/MMBtu, for each of Unit 1 and Unit 2 in a Day (the "Combined Daily Inlet Average"), and (ii) the arithmetic average of the Hourly Average Stack Outlet Sulfur Dioxide Concentrations, expressed in lbs/MMBtu, for each of Unit 1 and Unit 2 in that Day (the "Combined Daily Outlet Average").

(c)     For each calendar day, TEP shall calculate the daily average SO2 reduction rate for Unit 1 and 2 as follows: (Combined Daily Inlet Average – Combined Daily Outlet Average) ÷ Combined Daily Inlet Average, expressed as a percentage (the "Daily Average Reduction Rate").

(d)     From and after April 1, 2007 (i.e., 91 days after December 31, 2006), each Calendar Day TEP shall calculate and record a 90-day rolling average Daily Average Reduction Rate calculated as the arithmetic average of the immediately prior 90 Daily Average Reduction Rates (the "Consent Decree Reduction Rate").

(e)     If the calculated Consent Decree Reduction Rate for a day is less than the 85% SO2 reduction requirement set forth in § 9 of this Decree, TEP shall be in violation of such SO2 reduction requirement for the last occurring calendar day included in the calculation of such Consent Decree Reduction Rate.

(f)     For purposes of this § 18, the following capitalized terms shall be defined as follows:

(i)     "Hourly Average Stack Outlet Sulfur Dioxide Concentration" means   the calculated arithmetic average hourly emission rate, expressed in lbs/MMBtu, derived from an SO2 and/or NOx continuous emission monitoring system and diluent (CO2 or O2) monitoring system consistent with 40 CFR 75, collected during an hour, beginning on the hour, using the SGS' existing SO2 Continuous Emission Monitoring System.

- 12 -

(ii) "Hourly Average Boiler Inlet Sulfur Dioxide Concentrations" means the calculated hourly inlet sulfur dioxide concentration, expressed in lbs/MMBtu, derived from all valid measurements or data points collected from the In-line Analyzer (referred to in §7) during an hour, beginning on the hour; provided however, that (A) in the event the In-Line Analyzer is not in operation due to maintenance and/or malfunction, TEP shall substitute for each hour the average sulfur dioxide concentration from the previous 30 days of data from such In-Line Analyzer; and (B) if the In-Line Analyzer has not yet been in service for 30 days, TEP shall use the previous 30 days of coal analysis as received from the coal vendor.

19. Unless explicitly specified elsewhere in this Decree, all average emission rates and average emission reduction efficiencies shall:

(a) include all periods of Startup, Shutdown, Malfunction, and emergency and

(b) exclude (i) data for Unit on a day that it has not operated for at least one hour; (ii) data for a Unit from periods when the Unit is not operating; and (iii) other inappropriate data as specified in the applicable EPA testing regulations at 40 CFR Part 60, Appendix A, and Part 75 (e.g., from periods of malfunction by the monitoring system).

## VII.   LIMITED REPORTING PERIOD

20. Within 30 days of the close of each calendar quarter for the 12 calendar quarters immediately following December 31, 2007, TEP shall provide Grand Canyon with a letter report reciting the (a) Consent Decree Emission Rates for NOx; (b) Consent Decree Emission Rates for SO2; and (c) Consent Decree Reduction Rates for SO2, for such quarter.

## VIII.   INTEGRATION WITH PERMIT

21.    All requirements set forth in Parts V and VI of this Decree (except §§ 5 and 6), including all definitions in Part III applicable to those Parts (collectively, the "Emission Limitations"), shall be incorporated into the Operating Permit as federally enforceable "Applicable Requirements" (within the meaning of that term as defined in 40 CFR § 70.2), including amending Attachment C of the Operating Permit (which lists "Requirements Specifically Identified as Applicable") to add these Emission Limitations.  These Emission Limitations shall supplement and not replace any existing limitation or standard in the Operating Permit: provided however, that nothing herein shall be deemed to affect the ADEQ's authority to modify any such existing limitation or standard in the Operating Permit.

22.    TEP shall submit to ADEQ an application to modify the Operating Permit to incorporate the Emission Limitations within 90 Days after this Consent Decree is entered by the Court.

(a)    The application shall address only the changes to the Operating Permit required by this Consent Decree.

(b)    The application shall fully recite the compromise resolution of the Litigation and the resulting issuance of this Consent Decree as the basis for the modification to the Operating Permit, and shall include, on terms consistent with 40 CFR 70.6(a)(3). compliance certification, testing, monitoring, reporting, and recordkeeping requirements sufficient to assure SGS' compliance with the Emissions Limitations.

(c)    The Operating Permit shall cite this Consent Decree as the authority for the Emission Limitations.

(d)    Grand Canyon shall have no less than twenty (20) days but not more than 30 days to submit comments to TEP on a draft of the application respecting the issue of conformance with this Decree prior to submission of the final application to the

ADEQ. In the event Grand Canyon requires more than 30 days to review and submit comments to TEP or the comments are such that it requires substantial time for resolution, the 90 day requirement for submitting an application to ADEQ shall be extended by mutual agreement.

(e)   A copy of the final application submission shall be provided simultaneously to ADEQ, Grand Canyon and EPA Region IX.

23.   After any termination of this Decree, TEP shall not, in any subsequent application for a modified or renewed Operating Permit for the SGS, seek to revise any Emission Limitation incorporated into the Operating Permit to the extent any such revision would render such requirement less stringent.   This provision shall survive as an enforceable obligation between TEP and Grand Canyon.

## IX.   COMPLIANCE WITH APPLICABLE LAWS

24.   This Decree is not a permit, and it does not relieve TEP of its responsibility to comply with all federal, state, and local laws, permits and regulations and any orders of this Court. Notwithstanding the foregoing, in the event of any direct conflict in TEP's compliance obligations arising under this Decree and federal, state, and local laws and regulations, the more stringent requirements shall apply   For the purpose of this Decree, any change to federal, state, and local laws and regulations that would have the effect of relaxing TEP's obligations under this Decree shall not apply.

## X.   ENFORCEMENT

25.   This Decree is an enforceable document and agreement among the Parties. After entry by the Court (as contemplated by Part XIII of this Decree), the Emission Limitations shall be enforceable by Grand Canyon, ADEQ, EPA and citizens.   After any individual Emission Limitation has been incorporated into the Operating Permit (as provided in Part VIII of this Decree), such Emission Limitation shall not be enforceable through this Decree, but shall be enforceable by ADEQ, EPA and citizens on the same terms as other "Applicable Requirements" of the Operating Permit.

26.     If TEP violates any requirement of this Decree, Grand Canyon may seek any legal or equitable remedy to achieve full compliance with such requirement. TEP reserves all rights and defenses to an enforcement action by Grand Canyon not expressly precluded by this Decree, and nothing in this Decree shall constitute a waiver of such rights or defenses.

27.     Any termination of this Decree shall not affect any matter expressly set forth in this Decree that is to survive as an agreement between Grand Canyon and TEP.

## XI.    NO PREVAILING PARTY AND COSTS

28.     Neither TEP nor Grand Canyon is the prevailing party in this Litigation. Except as otherwise separately agreed to between TEP and Grand Canyon, each Party shall bear its own costs and expenses incurred in connection with the Litigation, this settlement and the actions contemplated by this Decree, and neither Party shall assert any claim against the other Party for attorneys' fees, expert witness fees, or any other cost or expense in connection with such matters.

29.     This Court's July 2, 2003 Order [Dkt. 119], granting in part TEP's Motion for Award of Attorneys Fees and Expenses [Dkt. 101] (stayed pending the appeal to the Ninth Circuit) is WITHDRAWN as moot.

## XII.    RETENTION OF JURISDICTION

30     The Court shall retain jurisdiction of this matter for the purpose of implementing and enforcing the terms and conditions of the Decree.

## XIII.    NOTICE OF DECREE

31     Pursuant to 42 U.S.C. § 7604(c)(3), TEP promptly shall lodge this Decree with the Court and simultaneously deliver this Decree to the Attorney General of the United States and the EPA Administrator for review for a period of not less than forty-five (45) days. After the conclusion of the review period, TEP shall promptly move the Court for the entry of the Decree, and the Decree may be entered by the Court.

- 16 -

32.    The Parties agree to cooperate in good faith to obtain prompt review of this Decree by the Attorney General, EPA and the Court.  If the Attorney General, EPA or the Court comment on the Decree, and as a consequence the Decree is not entered, the Parties agree to discuss such comments and attempt to make such revisions as necessary to obtain entry of the Decree.

## XIV.   EFFECTIVE DATE OF DECREE

33.    This Decree is effective on the date the Decree is issued by the Court.

## XV.   EFFECT OF SETTLEMENT

34.    This Decree constitutes a complete and final release by Grand Canyon of all claims for violations alleged in its Complaint and of all claims asserted in its petitions to EPA objecting to the terms of the SGS Title V operating permit (the "Covered Matters"). The preceding sentence shall not be construed to waive or nullify any rights that any person or entity not a signatory to this Decree may have under applicable law.

35.    Grand Canyon and TEP each expressly reserve all rights, defenses, claims, demands, and causes of action that either may now or in the future have with respect to any matter, transaction, or occurrence relating to Springerville that are not Covered Matters or that are not rights, defenses, claims, demands or causes of action asserted in, Grand Canyon Trust, et al. v Arizona Corporation Commission, et al., No. 1CA-CV 04-0079 (filed February 22, 2005) or in any Supreme Court review of said decision.

36.    Except for breach of this Decree, Grand Canyon covenants not to sue TEP, its officers, agents, successors, or assigns for Covered Matters.  Nothing herein shall prevent Grand Canyon from seeking any legal or equitable remedy to enforce the requirements of this Decree.  This covenant not to sue does not pertain to any matters that are not Covered Matters or that are not rights, defenses, claims, demands or causes of action asserted in Grand Canyon Trust, et al. v. Arizona Corporation Commission, et al., No. 1CA-CV 04-0079 (filed February 22, 2005) or in any Supreme Court review of said decision.

# XVI.   MISCELLANEOUS

37.   <u>Notice To Parties</u>.  Whenever this Decree requires a Party to provide notice or submit a document to another Party, the notice or document shall refer to this Decree and shall be sent to the following persons:

<u>For Grand Canyon Trust</u>:

Attn:  Executive Director
Grand Canyon Trust
2601 North Fort Valley Road
Flagstaff, AZ 86001

Phone (928) 774-7488
Fax (928) 774-7570

<u>With a copy to</u>:

Wilmer Cutler Pickering Hale and Dorr LLP
Attn:  Jeffrey J. Davidson, Esq.
1455 Pennsylvania Avenue, NW
Washington. DC  20004

Phone (202) 942-8409
Fax (202) 942-8484

<u>For Tucson Electric Power</u>:

Tucson Electric Power Company
Attn:  General Counsel
1 South Church Avenue
P.O. Box 711
Tucson, Arizona  85702

<u>With a copy to</u>:

Hunton & Williams
Attn:  Henry V. Nickel, Esq.
1900 K Street, NW
Suite 1200
Washington, DC 20006-1109

Phone (202) 955-1561
Fax (202) 778-2201

A Party may change the name, title, address, telephone number or fax number of a contact person identified above by providing written notice to the other Parties.

38.   <u>Severability</u>.  If any provision or authority of this Decree is held by a court of competent jurisdiction to be invalid, if that provision or authority is severable from the remainder of the Decree, the remainder of the Decree shall remain in force and shall not be affected by the court's order and ruling.  If the application of this Decree to any party or circumstance is held by a court of competent jurisdiction to be invalid, the application of this Decree to other parties or circumstances shall remain in force and shall not be affected thereby.

39.   <u>Headings</u>.  Any section or paragraph heading in this Decree is provided solely as a matter of convenience to the reader and shall not be construed to alter the meaning of any provision of this Decree.

40.   Authority. Each undersigned representative of a Party to this Decree certifies that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party to this document.

41.   Counterparts. This Decree may be signed in counterparts.

42.   The undersigned Parties enter into this Decree and, subject to Part XIII hereof, submit it to this Court for approval and entry.

Dated by the Parties as of April 15, 2005.

**THE GRAND CANYON TRUST**

Date: 4-19-05

By: *Richard Dame*

Its: *Associate Director*

**TUCSON ELECTRIC POWER COMPANY**

Date: _____

By: _____

Its: _____

- 19 -

40.   Authority.  Each undersigned representative of a Party to this Decree certifies that he or she is fully authorized to enter into the terms and conditions of this Decree and to execute and legally bind such Party to this document.

41.   Counterparts.  This Decree may be signed in counterparts.

42.   The undersigned Parties enter into this Decree and, subject to Part XIII hereof, submit it to this Court for approval and entry.

Dated by the Parties as of April 15, 2005.

**THE GRAND CANYON TRUST**

_____   Date: _____

By:_____

Its:_____

**TUCSON ELECTRIC POWER COMPANY**

_____   Date: ___4/25/05_____

By:_Michael J DeConcini_

Its:_Senior Vice President_

- 19 -

1    Upon review of the foregoing Consent Decree filed by the parties and the parties'

2 demonstration that the requirements of 42 U.S.C. § 7604(c)(3) have been satisfied, and

3 upon the parties' Joint Motion For Entry Of Consent Decree Between Grand Canyon Trust

4 and Tucson Electric Power Company, it is hereby

5    ORDERED that the Court grants the Joint Motion For Entry Of Consent Decree and

6 does approve and enter the Consent Decree in the form lodged with the Court on April 26

7 2005.

8    DATED June 22 , 2005.

9    _____

10   Honorable Earl H. Carroll
     United States District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

US1DOCS 5062684v1